203 So.2d 530 (1967)
Joseph P. HURLEY, As Bishop of the Diocese of St. Augustine, Appellant,
v.
Albert C. WERLY, Individually and As Trustee, and LaVoie Realty and Insurance, Inc., a Florida Corporation, Appellees.
No. 7130.
District Court of Appeal of Florida. Second District.
November 1, 1967.
*531 John A. Nelson, of Nelson, Beckett & Nelson, St. Petersburg, for appellant.
William H. Fleece, of McCutcheon, Fleece & Kennedy, St. Petersburg, for appellees.
PIERCE, Judge.
This is an appeal by plaintiff below from an amended final decree adjudicating a forfeiture of an escrow deposit of $5,000 made by plaintiff under a contract for purchase of real estate.
On January 7, 1966, plaintiff Joseph P. Hurley, as Bishop of the Diocese of St. Augustine, filed complaint in the Pinellas County Circuit Court, alleging that on August 1, 1965, he entered into a written contract for the purchase of certain real property from defendant Albert C. Werly, Trustee, for a purchase price of $50,000, $5,000 cash and the balance of $45,000 to be paid "upon delivery of abstract of title showing record merchantable and insurable title in the seller". The contract obligated Werly to "furnish an abstract of title recertified to date showing title as above required". An abstract of title was duly delivered to plaintiff's attorney (hereinafter referred to as Nelson), who thereupon pointed out certain title defects to defendant (hereinafter referred to as Werly), who then attempted to remedy the defects by affidavits and like material; but on December 10, 1965, Nelson wrote Werly a letter enumerating the title deficiencies and setting forth why the defects had not been remedied.
Thereafter, on December 15, 1965, Nelson notified Werly that "the 60 day period which the contract allows to the seller, [Werly] to remedy the defects in record merchantable title has expired", that good title had not been tendered as called for by the contract, and that plaintiff "does hereby exercise his option to recall the deposit and to cancel and avoid the contract".
In this state of the controversy, plaintiff filed his complaint for declaratory decree, asking that the Court declare that the contract required Werly to furnish a merchantable title of record, to direct the broker to return to plaintiff the escrow deposit money, and for other relief not here material.
Defendant Werly answered the complaint, denying that the title shown by the abstract was unmarketable, but that he had nevertheless furnished certain affidavits, etc., to support the title, that the Court declare the contract to obligate Werly to furnish only marketable title "in fact" and not marketable title "of record", and that the Court decree specific performance by requiring plaintiff to "complete the purchase" of the property.
After the cause was at issue, Werly on February 24, 1966 served upon Nelson a notice that he would take plaintiff's deposition on March 11, 1966. On February 28, 1966, Nelson filed motion, pursuant to Rule 1.24(b), Fla., R.C.P., 30 F.S.A., for a "protective *532 order" on behalf of plaintiff, which motion was denied on March 7, 1966.
On March 15, 1966, Werly filed motion under Rule 1.31(d), F.R.C.P., for final decree of specific performance because plaintiff did not appear on March 11, 1966 for his deposition. On April 4, 1966, the Circuit Judge entered final decree, reciting that plaintiff had "refused" to appear for his deposition, although he "was not immune from being so deposed", and thereupon decreeing specific performance against plaintiff.
Plaintiff's petition for rehearing prompted the Court to enter an amended final decree, rescinding specific performance of the contract, but decreeing the $5,000 deposit money to be forfeited by plaintiff as liquidated damages; and it is this decree that plaintiff appeals to this Court.
We reverse.
While the parties pose several diverse points, we believe two questions are determinative of disposition here, viz.: (1) was the lower Court justified in holding plaintiff in default, and (2) was the Court in any event warranted in summarily decreeing for Werly on his answer without adjudicating marketable title. We answer both questions in the negative.
1. The Default. There are three reasons why the Court should not have peremptorily found plaintiff in default, namely: (a) whether plaintiff in his representative capacity is subject to the discovery statutes, (b) materiality of plaintiff's testimony, and (c) whether plaintiff "willfully refused" to appear for deposition. We will discuss them in such order.
(a) In 1881 one Reid conveyed to John Moore, Bishop of the Roman Catholic Church of St. Augustine, Florida, a tract of land in Orlando. Years later, after Bishop Moore's decease, a devisee of Reid claimed the property because the original deed did not contain the words "heirs" or "heirs of the body", which, under the then statutes of Florida, was essential to convey more than a life estate. The then Bishop Barry filed suit to clear the title.
The Orange County Circuit Court denied the claim of Reid and the Supreme Court affirmed in Reid v. Barry, 1927, 93 Fla. 849, 112 So. 846. The opinion held that Bishop Moore's status as Bishop of the St. Augustine diocese of an established Church constituted him, under the common law in force in Florida, "a corporation sole", and as such immune from the State law aforesaid. We quote from Justice Brown's opinion in Reid, applicable to "a corporation sole", as follows (text 112 So. 859):
"But * * * the deed in question here * * * would appear to be sustainable upon an old doctrine of the common law, namely, that of the `corporation sole.' As hereinabove referred to, in another connection, the State of Florida adopted, by statute, the common law, in so far as the same is not inconsistent with our Constitution and statutes. Both our Constitution and our statutes provide means for the formation of corporations aggregate, but we find nothing in either Constitution or statutes which either expressly or impliedly repeals the ancient common-law institution of the `corporation sole.'
"Blackstone in Book I, p. 470, tells us:
`The first division of corporations is into aggregate and sole. Corporations aggregate consist of many persons united together into one society, and are kept up by a perpetual succession of members, so as to continue forever; of which kind are the mayor and commonalty of a city, the head and fellows of a college, the dean and chapter of a cathedral church. Corporations sole consist of one person only and his successors, in some particular station, who are incorporated by law, in order to give them some legal capacities and advantages, particularly that of perpetuity, which in their natural persons they *533 could not have had. In this sense, the king is a sole corporation; so is a bishop; so are some deans, and prebendaries, distinct from their several chapters; and so is every parson and vicar.'
"And on page 472 he further says:
`But, with us in England, the king's consent is absolutely necessary to the erection of any corporation, either impliedly or expressly given. The king's implied consent is to be found in corporations which exist by force of the common law, to which our former kings are supposed to have given their concurrence; common law being nothing else but custom, arising from the universal agreement of the whole community. Of this sort are the king himself, all bishops, parsons, vicars, churchwardens, and some others; who by common law have ever been held, as far as our books can show us, to have been corporations, virtute officii; and this incorporation is so inseparably annexed to their offices, that we cannot frame a complete legal idea of any of these persons, but we must also have an idea of a corporation, capable to transmit his rights to his successors at the same time.'
"In volume II, pp. 273, 274, of Kent's Commentaries (13th Ed.), we find the following:
`Corporations are divided into aggregate and sole. A corporation sole consists of a single person, who is made a body corporate and politic, in order to give him some legal capacities and advantages, and especially that of perpetuity, which, as a natural person, he cannot have. A bishop, dean, parson, and vicar are given in the English books as instances of sole corporations; and they and their successors in perpetuity take the corporate property and privileges; and the word "successors" is generally as necessary for the succession of property in a corporation sole, as the word "heirs" is to create an estate of inheritance in a private individual. A fee will pass to a corporation aggregate, without the word successors in the grant, because it is a body which, in its nature, is perpetual; but as a general rule, a fee will not pass to a corporation sole, without the word "successors," and it will continue for the life only of the individual clothed with the corporate character. There are very few points of corporation law applicable to a corporation sole. They cannot, according to the English law, take personal property in succession, and their corporate capacity, in that respect, is confined to real property.'
* * * * * *
"That the common-law corporation sole is, under our statute adopting the common law, the law in Florida to-day, seldom as it may be called into operation, there can be no doubt; and its application to this case is inescapable, and removes all doubt as to the capacity of the grantee and his successors to take the fee simple title. But whether we recognize the appellee, complainant in the court below, in his capacity as bishop, as a corporation sole or not, the analogy to the common-law corporation sole is so complete as to bring him within the spirit and reason of the doctrine relating thereto, * * *". (Emphasis supplied).
The above holding was reaffirmed by the Supreme Court in Willard v. Barry, 1933, 113 Fla. 402, 152 So. 411, wherein it was said:
"It is unnecessary for us to discuss the status of Rt. Rev. Patrick Barry, bishop of St. Augustine, Fla., as a corporation sole under the law of this state because that status has been determined by this court in the case of Reid v. Patrick Barry, 93 Fla. 849, 112 So. 846, 849".
*534 In 18 C.J.S. Corporations § 15, p. 393, is the following:
"A corporation aggregate is a corporation which is or may be composed of more than one member, as in the case of a jointstock corporation or a nonstock corporation of which there are two or more members, while a corporation sole is composed of a single member and his successors in the office.

"Illustrative of corporations sole are the king or queen of England, the chamberlain of the city of London, who could take a recognizance to himself and his successors in trust for the orphans, a bishop, dean, canon, vicar, abbot, or parson, etc., under the English law, who could take land in fee to himself and his successors, * * *" (Emphasis supplied).
All the authorities, including the two Barry cases from Florida aforesaid, emphasize that a corporation sole is, generally speaking, approaching obsolescence. But it is still the law of Florida. The Barry cases have not been overruled. Nor has the legislature seen fit to legislate. So we must recognize the legal status of a "corporation sole" under Florida law.
In doing so, we might well hold that a Church Bishop is immune from the Florida discovery rules because, being a corporation sole, he would be in the position of a king or sovereign under the old common law. But we do not choose to go that far.
Bishop Hurley, in his capacity as such, filed the complaint in this case. He invoked the Court's aid. He activated the judicial process. Yet he still, under the present law in Florida, apparently has the protective attributes of a "corporation sole". So while we do not hold outright that a Bishop can completely ignore the Courts or the Court rules of the State, we do say that the lower Court should have, in deference to his privileged legal status, proceeded more cautiously than precipitately, before visiting upon him the drastic penalty of an outright default. This would have suggested that the Court adopt other expedients to achieve the same result, such as requiring Werly to procure from other available sources whatever information he desired from the Bishop by deposition. Such would have obviated entering any final decree against plaintiff summarily on the merits by default, and without impairing the rights of any litigant.
(b) While the scope of an adverse party's deposition is admittedly broad, it is not unlimited, as the Florida Supreme Court recognized in Brooks v. Owens, Fla. 1957, 97 So.2d 693. Brooks was a negligence action, and the plaintiff sought by discovery to obtain information as to the limits of defendant's liability insurance. Upon defendant's refusal to respond, the Court struck his answer to the complaint and adjudged him in default. The Supreme Court granted interlocutory certiorari, even though it was a law action, and quashed the trial Court's order. After quoting the applicable Florida Rules and reviewing cases from other jurisdictions involving comparable rules, including federal Rule 26(b), Justice O'Connell, speaking for the Court, said (text 97 So.2d 699):
"It is our view that the rule [Fla.R. Civ.P. 1.21(b), a discovery rule] is applicable only to those matters admissible in evidence or calculated reasonably to lead to the discovery of admissible evidence. The matter must be relevant to either one of those expressed purposes concerning a pending action. It must pertain either to the proof or the defense of an action. The basic concept of our judicial system is to insure to citizens of this state and nation an entry into the courts for the purpose of (1) proving liability for an injury and (2) proving damages occasioned thereby. Limits of insurance carried by a defendant in a cause of action are not relevant to either of those basic purposes. Rules of discovery adopted by our courts are designed to secure the just, speedy and inexpensive *535 determination of every action. As said by the court in the Jeppesen case, supra, [Jeppesen v. Swanson, 243 Minn. 547] 68 N.W.2d [649] at page 658, that does not mean that information should be discoverable which is desired only for the purpose of placing one party in a more strategic position than he otherwise would be by acquiring information that has nothing to do with the merits of the action; there must be some connection between the information sought and the action itself before it becomes discoverable. We do not believe that such rules, procedural in design, should increase or otherwise alter basic substantive rights of either party to litigation." (Italics in text).
The pleadings in the instant case established the determinative question to be whether the abstract of title furnished by Werly to plaintiff disclosed marketable record title. In essence there was thus presented a simple question of law, viz.: whether the abstract showed such quality of title in Werly as the contract called for. In such posture of the case Werly sought discovery by deposition of plaintiff pursuant to Rule 1.21(b).
The 1st District Court had an analogous situation in Boucher v. Pure Oil Company, Fla.App. 1957, 101 So.2d 408, wherein discovery had been sought under Rule 1.27 (which was held to be comparable to Rule 1.21(b), concerning an essentially legal point involving the subject matter of the suit. In holding against such right of interrogation, the Court on appeal held that 
"* * * the sole issue involves the question of whether the information sought to be discovered comes within the scope of `any matter * * * which is relevant to the subject matter involved in the pending action * * *' And, the solution turns upon the intended meaning of the term `any matter' as used in the rule.
"Black defines `matter' as `substantial facts forming [the] basis of claim or defense; facts material to issue * * *' as distinguished from law or opinion. In an interpretation of Rule 26, Federal Rules of Civil Procedure, 28 U.S.C.A., from which the Florida rule was virtually copied in toto, the United States Supreme Court expressed the view that although promulgated in the belief that `mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation * * * [and] * * * either party may compel the other to disgorge whatever facts he has in his possession * * *', that to allow unwarranted search into the mental impressions formed by counsel for an opposing party would pervert the purpose of the discovery rules. Recognizing that our rules were adopted from the federal rules and obviously intended to accomplish like results, it is evident that the `matter' referred to does not contemplate unwarranted inquiries into the mental processes of counsel regarding his opinion or conclusions as to the law and theory applicable to his case. Such information is merely counsel's impression and legal opinion and does not constitute facts germane to the cause upon which the issues are drawn between the parties.
"Respondent can gain no comfort from the argument that Rule 1.21(b) permits discovery of the identity and location of persons. To the contrary, this right is expressly restricted to those persons `* * * having knowledge of relevant facts.' Such restriction is persuasive evidence of an intent to permit discovery only of facts as opposed to law or opinion." (Italics in text).
We follow the rule approved by the 1st District Court in Boucher. Here the decisive issue had been effectually narrowed down by the pleadings to a strictly legal question, determinable by extrinsic written or printed material (the contract, abstract of title, and the written matter tendered in the effort to cure the alleged title defects). The assumption is therefore reasonably *536 warranted that Bishop Hurley's deposition could be productive of nothing relevant to the basic legal question of title sufficiency. Bolstering such assumption is the fact, placed in the record, that when the contract was originally executed plaintiff Bishop came into personal contact with no one except those in his own Church Chancery (business) office, and thereafter had no knowledge of developments in the matter except as such would be reported to him by his counsel.
In Southern Standard Life Insurance Company v. Holloman, Fla.App. 1963, 149 So.2d 887, the Circuit Court had entered order requiring the defendant insurance company to directly answer the question posed upon interrogatory discovery as to whether one Vinson, a party to the suit, was an "employee" of the company or merely its "agent" within the coverage of Vinson by Workmen's Compensation. The 1st District Court upon review by certiorari ruled that the information sought concerned a legal matter and hence not compulsory under the discovery rules, holding that 
"* * * the order appealed is not authorized and was improper in that it required the petitioner [insurance company] to answer the interrogatory with an opinion of law". (Emphasis supplied).
See also Rachleff v. Mahon, Fla.App. 1960, 124 So.2d 878.
We hold in the instant case that where the whole dispute involves an essentially legal question and where the basic facts are not in issue, plaintiff should not be involuntarily deposed.
(c) On February 24, 1966, Nelson received notice that Werly would take the deposition of plaintiff on March 11, 1966. On February 25, 1966, Nelson served upon Werly plaintiff's motion under Rule 1.24(b) for protective order, asking that the notice be suppressed and the Court not require the deposition be taken. On April 4, 1966, the Court entered final decree on the merits in favor of Werly, predicated upon the default of plaintiff.
Nelson was diligent in filing motion for protective order on February 25, 1966, the day following receipt of deposition notice, and it was March 7, 1966 before the motion was denied. Plaintiff Bishop did not appear on March 11th, although Nelson was present and made explanations. Three days thereafter, on March 14th, Werly filed his motion for final decree for failure of plaintiff to appear. Between that date and April 4, 1966, when the Court entered final decree, counsel for both parties were engaged in filing motions, affidavits, etc., bearing upon the procedural entanglement.
When the decrees were entered, the Court had before it the following facts, gleaned from the record: that at all times pertinent the abstract of title and other documents had been in possession of respective counsel and the Bishop had never seen or had them in his possession; that after the motion for protective order was denied on March 7th, Nelson had several times tried to contact the St. Augustine Diocese without success, attributable probably to the ceremonies attendant to the dedication of the renovated Cathedral Church in St. Augustine; that on the evening of Thursday, March 11th, he was finally able to contact one Father Kohls of the St. Augustine diocese to make a report of the situation; that Nelson had advised Werly that plaintiff Bishop was a "corporation sole" under Florida law but the Bishop would still be willing to be deposed by Werly if desired; and lastly, that Monsignor Nugent would likewise be made available for deposition.
In our opinion the lower Court under the circumstances erred in holding plaintiff in default and entering the final decrees.
Rule 1.31(d), Fla.R.C.P., a part of the discovery Rules, provides:
"If a party * * * willfully fails to appear before the officer who is to take his *537 deposition after being served with the proper notice * * * the court on motion and notice may * * * enter a judgment by default against that party". (Emphasis supplied).
This is known as the "sanction" portion of the discovery Rules. It is not penal. It is not punitive. It is not aimed at punishment of the litigant. The objective is compliance  compliance with the discovery Rules. The sanctions are set up as a means to an end, not the end itself. The end is compliance. The sanctions should be invoked only in flagrant cases, certainly in no less than aggravated cases, and then only after the Court has given the defaulting party a reasonable opportunity to conform after originally failing or even refusing to appear. This is unmistakably the trend of judicial thinking in Florida on the "sanction" Rule.
The 1st District Court, in State Road Department v. Hufford, Fla.App. 1964, 161 So.2d 35, held that while Rule 1.31(d) subjects the defaulting party to the sanctions therein described, "such penalties must be applied within the orbit of a sound judicial discretion" and that a final adjudication on the merits because of such default "without first affording party in default an opportunity to cure the default * * * constitute[s] an abuse of discretion", requiring a reversal.
The 3rd District Court, in Hyman v. Schwartz, Fla.App. 1965, 177 So.2d 750, quoting at length from Hufford, held that the action of a trial Court in adjudging a default and proceeding summarily to the merits for failure to properly comply with the discovery Rules "is a harsh remedy and should be cautiously applied"; likewise requiring a reversal.
And again, the 3rd District Court, in Remington Construction Co. v. Hamilton Electric, Inc., Fla.App. 1965, 181 So.2d 183, held to the same effect. Indeed, Judge Barkdull in Remington Construction, citing the Hufford and Hyman cases, supra, held that before the sanctions of Rule 1.31(d) could be invoked a "prior order directing" compliance was a condition precedent, even though Rule 1.31(d) did not in terms require such prior order; again resulting in reversal.
Lastly, the 3rd District Court, in Thornton v. Board of County Commissioners of Dade County, Fla.App. 1963, 149 So.2d 393, reversed the trial Court for applying the sanctions of Rule 1.31(d) even where the plaintiff "had failed on more than one occasion to appear at time he was noticed for taking of his deposition."
Plaintiff here was held in default for not appearing four days after his protective motion was ruled upon. He was given no subsequent opportunity to depose, although he offered in writing so to do. He also offered to have Monsignor Nugent depose. He showed abundant good faith, even though he allegedly knew nothing that would throw light on the title marketability.
2. Entry of Decrees on Werly's Counterclaim. As hereinbefore observed, plaintiff's complaint was for declaratory decree construing and cancelling the sales contract between the parties, and Werly's counterclaim was for specific performance against plaintiff upon the same contract. Two subsidiary questions were necessarily embraced in the main question: (1) whether the contract required Werly's title to be marketable "in fact" or marketable "of record", and (2) whether the alleged title defects were cured by the documentary evidence later submitted by Werly.
The solution of the first subsidiary question is found in the language of the contract itself, which required plaintiff to complete the purchase "upon delivery of abstract of title showing record merchantable and insurable title in the Seller (Werly)". (Emphasis supplied). This covenant was a condition precedent.
The intention of the parties to a contract is to be deduced from the language *538 employed, and the language so employed is controlling, if it can be reasonably interpreted. Stokes v. Victory Land Co., 1930, 99 Fla. 795, 128 So. 408; Durham Tropical Land Corporation v. Sun Garden Sales Co., 1931, 106 Fla. 429, 138 So. 21; Trail Burger King, Inc. v. Burger King of Miami, Inc., Fla.App. 1966, 187 So.2d 55.
The word "record" in the instant contract speaks for itself. And the word "insurable" is also significant because it is common knowledge that real property titles are never insured except upon record evidence.
The Supreme Court has recognized this. In Allen v. Bowman, 1943, 152 Fla. 325, 10 So.2d 905, the Court held:
"When appellee agreed to furnish an abstract showing `good and marketable and/or insurable title', he agreed to show by that abstract a good and marketable record title as distinguished from one that might be good in point of fact but dependent in material respects upon matters in pais to support its validity. DeHuy v. Osborne, 96 Fla. 435, 118 So. 161."
As to the remaining questions involved, namely, whether the abstract as tendered showed a marketable record title in Werly, and whether the questioned defects were cured by the material furnished by Werly, we pretermit discussion. The lower Court grounded its decrees upon the "default" of plaintiff in not appearing for deposition, and that Court upon remand should have the opportunity to determine initially the legal question of title in entering a new decree on the merits. In such situation, it would be improper for us now to intimate our views thereon.
Reversed and remanded with directions to the lower Court to take further proceedings herein not inconsistent with our views as hereinbefore expressed.
ALLEN, Acting C.J., and HOBSON, J., concur.